May it please the Court, my name is Rex Heineke. I am here on behalf of the appellants. I would like to reserve five minutes of time for rebuttal. We think the first question that the Court should decide is the question of legislative privilege, because that affects what evidence we have to prove our Shaw claim here, and we obviously would like additional evidence to prove that claim. So we think that's the first issue the Court should resolve. Now on that question, why do we believe that there's only a qualified privilege here? Well first, because we agree that the Shaw standard is very high, but unless we can conduct discovery as to the decision makers here, as to the redistricting, members of the city council and so on, then it makes it virtually impossible to prevail on a Shaw claim. So what? What does that have to do with the privilege? I mean, there's lots of privileges out there, and parties can raise all sorts of reasons, you know, attorney-client privilege, but boy, if we just had this information, it would be so helpful to us. I understand. If that were a good argument, most privileges would be quite shaky. Right. So why do you start off with that argument, which seems to carry no weight whatsoever? Well, Your Honor, I think it carries some weight, but I agree with you that it doesn't, it's not dispositive here. My only point is that... You know, you agree with me as to something I didn't say. All right, well then, I'm sorry. What I said is, it's irrelevant, and you want to say I agree with you that it's not dispositive. So you think you're going to fool me? No, Your Honor. You're not going to know what I said? You think anybody else in the courtroom is not going to realize you're trying to pull a fast one? So why don't you answer my question? Why is the fact that you need this evidence very badly of any relevance whatsoever when it comes to a matter of privilege? If it's a privilege, you can't use it, and your need for it is generally, as far as I know, irrelevant. All right, Your Honor. Then let me move to my next point. I see. So you start off with an irrelevant point, so you're going to move on to something... Hopefully irrelevant, Your Honor. Hopefully. Since the court thinks it's irrelevant. Well, no, I mean, argue with me. Tell me if I'm wrong about that. I mean, you chose it as your opening point. If you think, you say, oh, the court thinks so, well, you tell me, what do you think? Why don't you persuade me that, in fact, it is relevant? I think you've persuaded me, Your Honor, so I think I should move on. Well, isn't your argument if it's an absolute privilege, it's not relevant at all? If it's a qualified privilege, need is a factor. Need is a big factor. Why don't you argue that? Well, we do. We argue that what should be here is a qualified privilege. And we think that the law supports that, including the U.S. Supreme Court case in Gilcock. But whether it is qualified or not has no – doesn't matter how badly you need it. It is as qualified or it is absolute, right? I think if it's qualified – So why is it qualified? Why don't you explain to us – why don't you talk to that issue? All right. And I think that's what the Gilcock and the Third Circuit decision in re-grand jury speak to, why the privilege, legislative privilege, should be qualified. In Gilcock, the Supreme Court said that the speech and debate clause did not justify an absolute legislative privilege for state and local officials. It then went on to consider comity. And what it said as to comity is, and I quote, where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields. Now, that's certainly – Gilcock is indisputably a criminal case. But the point is that the Supreme Court said there that where there are important federal interests at stake, any legislative privilege should yield. And we submit there are obviously important federal interests at stake here. That is whether or not these city council districts are drawn on a racial basis or not. So the interest here of the federal government or federal system in ensuring that that doesn't happen, we submit are very important interests and meet the test in Gilcock. The response to that by the defendants is to say, well, this is going to make it very hard for us to conduct business. It's going to interfere with what legislators do. But what the Supreme Court said in Gilcock was the recognition of an evidentiary privilege for state legislatures for their legislative acts would impair the legitimate interests of the federal government in enforcing its criminal laws with only speculative benefit to the state legislative process. And so what do we have here? We have a very important federal interest. But what's speculative about the idea that you would be deposing every member of the legislature as to any matter that can be said to have some sort of federal implication? What's speculative about that? Well, it's not speculative that you would do it, but the harm which the defendants assert is speculative. That's what the Supreme Court said in Gilcock. Well, how about the fact that they'd be spending all this time in depositions? Well, all this time, we're not arguing here that the district court has no power under its normal powers to control discovery. What we're saying is that there is only a quality. This is not a rule just for your case. This is a rule for any case raising a federal issue as to state and local legislation, right? Yes, I understand. So why wouldn't we have sort of an industry of people deposing legislators, city council people, members of the county board of supervisors, the water district, the school district, the board of education? I mean, you know, think about the Coastal Commission. Almost everything they do is arguably a taking of property in violation of the Fifth Amendment, right? I mean, believe me, if you're a property owner, that's what you think. Why wouldn't they be in depositions all day, you know, pretty much 24 hours a day about whether or not because it's implicated the Fifth Amendment right to property? Well, I think that's a good question, Your Honor, but I think the answer to it. Thank you. I always love to be a compliment on my questions. I think the answer to it. Thank you. You're making all the mistakes of a rookie. Your Honor, I think the answer to it is that when you have a case where motive is central to the case, then the qualified privilege comes into play. You know, things are central to the case whenever a plaintiff chooses to make them central to the case. You know, the case is much controlled by what plaintiff does, so I'm not sure how that distinguishes your case from any other case. Well, Your Honor, I think it does. If you look at the Supreme Court's decision in Village of Arlington Heights, what it says there is that the district court did not abuse its discretion in not allowing discovery of legislators there to their motive because motive wasn't an issue in that First Amendment case, and so there was no reason that you could go depose them about their motive. Motive here is central to a Shaw claim, and so that distinguishes it from other cases. We're not arguing that in any case where there's a federal interest that there's a limited or qualified legislative privilege. At the very least, though, your argument would mean that every case challenging a district of any sort would authorize deposing all the legislators, right? I don't think that we're saying that, although we think that, yes, in a lot of cases it would raise that issue. I'm not asking whether you are saying that. I'm asking whether that would be the natural implication or the necessary result of any ruling in favor of this. Well, we don't think so, Your Honor, because we think there's another thing that distinguishes this case from what I'll call a run-of-the-mill case, which is not only the intent issue but that we have significant evidence here of racial motivation. That is, we're not just going in and saying, this is an intent case, we hope somewhere we could find some evidence about this and therefore let us conduct unlimited discovery with the legislative body. We have evidence of racial intent here, racial motivation. So you're limiting your request to those legislators who made those statements? No, we think that, no, we're not doing that. When somebody makes a statement like that, then that opens up the entire legislative body. I'm starting to understand what you're saying. It opens it up because now there's real evidence and it's a real issue. It's not just a fishing expedition in the hope that, gee, somehow, somewhere we might find something. We've got things, and that should open the door to our conducting discovery on that issue. Now, I would have thought that that is something that goes, if the district judge has discretion, the existence of these statements would go to the question of whether discretion was abused, not to the question of whether there was discretion to begin with. You're treating it as sort of a gateway. If there is such a statement, then this becomes a kind of case where you can have discovery. I would have thought that if you have such a statement, that would bear on the district judge's exercise of discretion. Well, yes, we think that's one of the factors to be considered under the qualified privilege. We said that in our brief, that there are a number of factors to be considered in the court, the district court deciding whether to allow discovery. That's one of the factors. So you're not saying that the existence of these statements bears on whether there is a qualified privilege as opposed to an absolute privilege? Well, I think it bears on both, actually. But it certainly bears on the elements of a qualified privilege and what discovery we're entitled to conduct. And it's relevant, I think, to the question of absolute or qualified privilege because of the concern you expressed, the concern that you don't want to open the door and say in any case where you make a federal claim, you can go and dispose anybody in the legislature about anything they may have thought or did or why they did it. We understand that's way too broad, not acceptable. And do you concede that if you don't get discovery, you lose? No, because we don't know what the standard is. The Supreme Court just heard argument about a month ago in two cases that are supposed to set forth what the standard for a Shaw claim is. So we don't know what the standard for a Shaw claim is until those cases are decided. So you want us to defer submission until those cases get decided? I don't think the court needs to defer the legislative privilege question because I don't believe those cases involve that issue. But I think the court does need to defer the summary judgment question because the Supreme Court, maybe it doesn't change the standard. We don't know what it's going to do, but it's going to do something. We don't usually issue two opinions. I understand. So I think the net result of that is that the court probably should wait and see what happens with the U.S. Supreme Court and what standards it sets forth and then see whether those standards are compatible with what the district court did here and the evidence that we presented. Can I hear you address the question whether let's assume the standard is resolved favorably to your position. Yes. Why don't you still lose even under that more forgiving standard? Well, I guess the question is precisely what that standard is. I don't know what it's going to be. Well, that if you have direct evidence, and we can debate whether you have direct evidence here, but if you have direct evidence that race was the predominant factor in the drawing of the lines, it doesn't matter that the shape of the district also happens to coincide with traditional redistricting principles, that that would be enough. And I guess that's what I'm questioning. Let's assume that's true. You have strong evidence as to what Mr. Ellison's motive might have been, but I guess I'm having trouble tracing that up the chain to understanding, well, why does that prove that even a majority of the city council folks? Well, it may not be definitive proof, but what we're saying is it raises a triable issue here as to just what the motivation was, especially when Mr. Ellison's email that set out the information about racial intent was sent to the city council when it voted on this. It's not like they'd never heard of it or it's just something that happened back in some committee. So they knew that was what the intent was in drawing the districts, and Mr. Ellison is quite clear that he's moving people in and out of the district to change its racial composition. It's not to, as to Palms, for example, turn it into all of Palms in one city council district. But just in a case, though, where the changes in the shape and composition of the district could be explained on race neutral, traditional redistricting grounds. Fine. You have the person who drew the initial map maybe being motivated where race was the predominant motive. But when it comes time to the city council folks to vote on it, why would we infer that they're going to vote on it because of some illicit motive as opposed to a perfectly lawful motive that is also fully supported by the changes that remain? On summary judgment, all inference is supposed to be in our favor. Also, I think that your question doesn't include the role of city council president Herb Wesson. It was his district that was being redistricted. He was the most senior person at the city council. He appointed Mr. Ellison to the redistricting commission. He said after the redistricting that the whole point of the way it was those two city council districts. Yeah. But he says it was me against 12. You know, it was basically me against the world. But, you know, I had to stand against all of my colleagues who weren't on board with my agenda. That's at least the implication from the remark he made. Right. Oh, I don't think that implication is there. But even if it is. Do you know which remark I'm referring to? I only know the remarks Mr. Wesson made after the redistricting. Right. That's what I'm talking about. It's in that same speech. Okay. I don't think that says that he did it. But even if he did, realistically, who has the most sway over their district? The incumbent. People horse trade those kind of things. Fine. You can have what you want as long as you let me have what I want in my city council district. So there at least is an inference here that through his appointing Mr. Ellison, who pursued a racial agenda for Mr. Wesson's district, and he's the head of the city council, that that's what happened. That it was race was the predominant reason for the drawing of the boundaries. For why the other 12 members, it was a 13-2 vote if I remember right, that the other 12 members, that they too were motivated by race. I think it creates a triable issue. Why? It just seems to me totally speculative. In a case where the district is explainable on grounds other than race. I'm with you in a situation where you've got a district where because of all the circumstantial evidence, you say basically if race wasn't the predominant factor here, there's no other way to explain this. But in a case where it is explainable on non-racial grounds, I don't think, you can't just speculate and assume that, well, everybody must have had a motive that would violate the law. Why would we do that? I think what you're then saying is if after the fact the defendant here can come up with something and say, oh, well, that's consistent with traditional redistricting criteria, you lose even though you have evidence of racial motivation. Also, I would submit that this isn't all consistent with traditional redistricting criteria. If you look at Palms, a council district 10 was underpopulated. It needed more population. What happened with Palms? They moved thousands and thousands of people out of council district 10. That's contrary to traditional redistricting legislation, even if it also had the effect of uniting those two or putting Palms in all one council district. So it's not something where it's clear that was the criteria, that that's what was being done, when what is being done is contrary to some redistricting criteria and is said to be based on race. Also, the case or at least one of the cases in the Supreme Court, the Bethune Hill case, involves precisely this question. What do you have to prove to show racial predominance if there's evidence of traditional redistricting criteria? I'd like to reserve the minute. Thank you. Okay. We'll go to the other side. May it please the Court, Robin Johanson on behalf of the City of Los Angeles, defendant in the case. Mr. Hanke began with legislative privilege. I'm happy to go there first, but I really think that the appropriate place is to start with the standard and what this court should look at in deciding whether summary judgment was properly granted by the district court. And with that, the plaintiffs are suggesting that the cases that are currently before the United States Supreme Court will somehow shed light on this case. And respectfully, that's not going to happen, because what happened here is so very different from what's going on in those cases and in every other Shaw case with one exception. And that's Cromartie 2, Easley v. Cromartie 2, because that's the only case in which you don't have the state virtually conceding that race was a predominant factor, much less the predominant factor. What you've got in those cases, particularly the Virginia and the North Carolina cases, are thresholds set by the state of African-American citizen voting age population below which they would not fall. That was the baseline. There's nothing like that here. Well, it depends on how central you view Mr. Ellison's role. I guess I beg to differ with you on at least the record that we have here at summary judgment. My goodness, a reasonable fact finder could certainly conclude that in Mr. Ellison's mind, race was the predominant factor in explaining both the move of Palms out of the district and the bringing of the folks from District 8 in. And yes, Your Honor, in Mr. Ellison's mind, perhaps a reasonable fact finder, and you, of course, have to give all the inferences favorable to the plaintiffs here. But that is one person and one person who had no vote on the final line drawing. But he prepared what the others voted on, right? No, Your Honor, he didn't. He was part of a group of seven who did an initial draft that was changed many, many times, particularly, you know, with respect to Council District 10. So to say that he changed many, many times, when? Well, when it first went to the commission, the commission considered amendments and made amendments to Council District 10. And then when it went to the city council, the city council actually reduced the African-American citizen voting age population down to 40.1 percent. So to say here that you have evidence that Mr. Ellison... But the baseline from which everybody worked was what Mr. Ellison's group presented, right? That was sort of the start. And why didn't that drive everything else? I mean, you could sort of haggle here at the margins here and there. But as you know, as a lawyer, what you want to do is you want to do the drafting. If you're negotiating a contract, you want to do the drafting and then have the other side haggle about the specific terms because the one who does the drafting has a big advantage. That's the momentum. So why couldn't a jury find that Mr. Ellison's... There was proof that his intent was racial, that it sort of so drove the process, the inertia created by his participation, that it tainted everything else? Well, first, I must respectfully disagree that there's proof that that was Mr. Ellison's intent. But for purposes of summary judgment, one must infer that. So starting with that. So why did you just say that? I said that. I'm sorry. I misunderstood. I said exactly that. I said there's a tribal issue of fact. Do you understand that tribal issue of fact means this is what's available for summary judgment, not that that's conclusive proof, right? You understand that, right? Yes, I do, Your Honor. The difference here is, again, we're starting with one person in a group of seven who had enormous pushback. We know from that, from the e-mail itself, that there was enormous pushback from three of the members of that group of seven. Then it goes to the full commission. Sounds to me like pushback from a minority, right? Yes, ultimately a minority, but not at all an acquiescent minority. So there was that pushback. So a jury could look at that and say Mr. Ellison's view prevailed. So he tainted that process. Taint, Your Honor, is not the standard here. Taint is unexplainable on grounds other than race. And as the questioning from Judge Watford, I think, reveals, these districts are explainable at every point. This district is explainable. Every single change. It might be, but we're at summary judgment and we're asking what could a jury find. I don't know why you glommed on to the word taint. I mean, you know, his view prevailed, and therefore he had a majority, and therefore his view is reflective of the, you know, if you don't want to use the word taint, that's fine. It was just a shorthand. And then his view prevailed in the group, and then, you know, he created the momentum that then carried through the remainder of the process. Why couldn't, why, once you concede that there is a tribal issue of fact, that there is evidence for the finding that he acted for racial motives, why couldn't, isn't there evidence that the jury could find that his role was so outsized, given the process and the momentum created by his participation, that it tainted everything else? Why is that not the case? That's not the case because the plaintiffs have presented not a shred of evidence to prove that. They've never connected the dots that they say are there to show that Mr. Ellison and Council President Wesson controlled this redistricting. And they couldn't, Your Honor. I don't think my question presupposes that they controlled it. It's just that, you know, that's what you put in front of the body, and then, you know, it's hard for the body to then come up with something completely different. What they do is they can sort of, they can pare things down, they can nickel and dime on the edges, but, you know, the thing that's in front of you is this thing that has the most weight. Why couldn't a jury come to that conclusion? Well, mainly because of the law from the United States Supreme Court. First, the United States Supreme Court says that there is a presumption, a presumption that must be recognized and overcome of good faith on the part of the legislature. In this case, the presumption- Well, nobody doubts good faith. I mean, they're all acting in good faith, but they're acting upon what's put in front of them. They're not sort of saying, well, you know, we're not going to come up with something completely different, you know, complete substitute. No, because if they tried to come up with something- I mean, what does good faith have to do with it, anyway? It's a presumption. It's a presumption that race was not the predominant motivator here. That's what it has to do with it, and that's Miller v. Johnson and all the other cases. But if they wanted to come up with something completely different, they would have to violate their chief redistricting criterion, which was to keep as many of these neighborhoods whole as they could. And they wanted to do that by- They showed they wanted to do that by voting that they were going to keep two-thirds of the neighborhood councils whole. They were going to do as much as they could to keep the renaming communities whole, which are smaller subsets. And in this case, that would be the Coria Town renaming community, which they did keep whole in Council District 10. They couldn't just upset this map because Council District 10 sits at the center of the map. It's not somewhere off in the valley or on the periphery of the city. It's right there in the middle of the city. So as soon as you try to change everything, if they had wanted to, it affects the entire rotation. It sounds to me what you're saying is that whatever Ellison's input was, was really difficult to change. So whatever he did that sort of moved it towards a shore violation, as evidence as there is, once he put it on the table, boy, it really got hard for them to do anything about it except pretty much vote into resistance. Your Honor- It sounds to me like you're helping the other side. No, because for this reason- Well, it sounds to me like you're helping the other side. Let me answer your question. The difference is that what Mr. Ellison had to begin with and the traditional redistricting criterion that he followed and all the rest of the Commission and the Council District followed was to try to keep as much of the district intact from the previous redistricting. Say you. I mean, they say he did it for racial reasons. That's what they say. That's what they claim. And you have conceded that there is evidence that would support that kind of finding by the jury. So we can't start by having a different premise, by saying, oh, well, just assume that he was doing it for these objective reasons. You have to start by saying he did it for these improper reasons. So now take it from there. And you take it from there to, well, why did the others do it? Why did the others say- Well, the other three that were with him because they maybe were persuaded for the same reasons. So they agree. They go along with him. Three oppose, but the other three plus him make a majority. And so you get this decision that it is for improper reasons. Then you get up to- But, Your Honor, the question is, is it difficult to change the, quote, race-based- You're the one who was arguing how difficult it is to- That's why I said, boy, you're really sort of helping the other side. I'm trying very hard. The more difficult you say it was to change at that point, the more I have to think that, boy, what they did back there really made a difference. Let me clarify, Your Honor. What I am saying is- Backtrack? Is that what you're talking about? A clarified backtrack, perhaps. Rewind the tape. What's going on here is what's difficult to change is the redistricting criteria on which the commission and then the city council were relying. And the plaintiffs have offered us nothing to show that those traditional redistricting criteria were subordinated to race. They've never even disputed that all of these can- All of these changes, which are small on the periphery, and that's why I'm suggesting that the question of if you're going to make wholesale changes, if the commission, after this had come out, had wanted to make wholesale changes to CD10, it would have changed the whole rotation of the map. That's what I was saying, Your Honor. Not that they couldn't have said, oh, Mr. Ellison, those are tainted by race. Those are- and even tainted, I must say, is not the problem. Race has to predominate. It's always a consideration in redistricting. It has to predominate in order for you to have a Shaw violation. It has to subordinate traditional redistricting criteria. They've not given us a thing that disputes that every single change from the 2000 map to the 2012 map is explainable on grounds other than race. It's explainable on two things. One, we want to keep as much of the district intact as we could from 2002. Every change we made to that district was done to heal some kind of neighborhood split. So every single change, and they're all around the periphery, and when you look at those changes, Your Honor, you see that the smaller part of the neighborhood was reunited with the whole. So every single change took the smaller part out of CD10, reunited it with the whole. There was one change that the City Council made that was important. Again, another redistricting criteria that is well respected. They said, we're going to give the Don's part of the district, which is in the south, back to Council District 8 because we want to accommodate Councilmember Parks so that his home will no longer be outside of his district. Perfectly acceptable. And that actually, of course, reduced the African-American population in CD10. The other thing that happened, of course, is that the commission and then the City Council brought in this huge neighborhood council about which the plaintiffs are complaining that was far more diverse, had a much lower African-American population than anything else. They brought it into CD10. If you are redistricting on the basis of race, you do not do that. Now, I have not yet addressed the legislative privilege question. We fully briefed it. In our view, even if the court finds that it's a qualified privilege, the district court weighed all of the factors properly. The district court looked at the kind of evidence that they were trying to get and said, this is not going to help your case, and it's improper under Village of Arlington Heights. And I must say, as far as Council's argument, Village of Arlington Heights involved race. Village of Arlington Heights was a race question. Gillick also is not applicable here because there the Supreme Court said, this is a criminal case. This is a criminal case against a state legislator. And they said, we draw the line at civil cases. So they recognized the privilege at civil cases. Can I ask you this? Let me just go back to the concession I thought you made at the outset, which was that if Mr. Ellison had, in fact, been the final decision-maker on this map, they would certainly be able to get past summary judgment, right? That there's a triable issue as to whether race predominated in his own mind. I think you conceded that. And if you didn't, I'm going to tell you that you should, because the record's pretty strong on that point. For purposes of argument, I will concede it. So am I understanding your argument right to say that, well, but they don't get past summary judgment on that because they haven't been able to show what was in the minds of the city council folks themselves, right? Because their intent is ultimately, they're the decision-makers. Their intent matters. And it seems to me your argument on the privilege front seems to cut pretty sharply against that, right? Because if that's what you're saying to them, then I understand perfectly well why they're saying, well, my goodness, let's go depose those people. And then you say, no, no, no, no, privilege, sorry. All right. And I would refer the court to the three-judge court's decision in the Kano case, because that's so directly on point here. And there you had the three-judge court upholding the legislative privilege with respect to the state legislative redistricting, upholding the legislative privilege and granting summary judgment in favor of the defendants. So despite the legislative privilege that the court upheld, they said, and even giving every inference in favor of the plaintiffs, that there was a racial element here. And I believe when you look at Kano, the court even said, even giving every inference that race was a predominant one, then we still are going to grant summary judgment, because you haven't shown that they're unexplainable on grounds other than race. And so the Kano case, I think, is really what sets the stage for the kind of redistricting that's going on here. Remember how public this process was. This was not a redistricting that happened in secret. This was not the kind of thing where you don't have any way of getting the evidence unless you depose the kingpin who was in charge of redistricting. That wasn't what was going on here. This was an incredibly public process, and it was debated all in public by 21 members of a commission and then 15 members of the city council plus the mayor. So I believe the question came up earlier from Judge Kaczynski, are you going to depose all those people? And what will that show you? Are you going to add up the numbers? I mean, how do you do that? And then what are the consequences if this court were to say that, that that's the appropriate standard? I can tell you right now. Good news for lawyers. Pardon me? Good news for lawyers. Good news for lawyers. I'm afraid it's bad news for the federal courts. I see grinning in the courtroom. You will become the redistrictor of last resort, I'm afraid, because what will happen will be every single case is going to come to you. Will attract such great law clerks. Will attract such great law clerks. Chance to work on redistricting. Very interesting stuff. But really not the way that we should be going about it. I want to leave with this one point, and that is when you look at everything the Supreme Court has said about Shaw claims, they've said these are exceptional cases. We are reserving a Shaw claim for the exceptional case. They've said you must take extraordinary caution. They've said you must take very deliberate and extraordinary caution in That kind of thing doesn't help that much, because people don't go around admitting these things very much. How would you come up with an exceptional? What would be an exceptional case, in your view? In every case in which the Supreme Court found a Shaw violation, they did admit it, mainly because these were exceptional cases. They were preclearance cases, weren't they? Pardon me? Weren't they preclearance cases? Yes. All right. So we are out of the preclearance. Isn't the preclearance all gone? The Voting Rights Act is gone and all that. So what is the universe of cases where you think it's exceptional? Are Shaw claims gone with the Voting Rights Act? I think virtually so, Your Honor, because what we have now is easy. Virtually is sort of a lawyer's word. So is there any case? Well, the two cases that are pending, as I mentioned, have thresholds. So they were admitting it, that that was their threshold. So they won't help us much? No, I don't think they will. What helps you is easy. So what's the exceptional case? Give me a hypothetical. I'm not sure we have an exceptional case, because the only case that you have before you is a problem with your argument saying, oh, they said it's an exceptional case. I mean, basically wanting to say that case doesn't exist anymore. So, you know, you make this argument. Again, it cuts against you, because if, in fact, there is no exceptional case, then sort of underscoring that language, oh, it's got to be exceptional, this is not this case because it's not exceptional, it doesn't help you any. You pretty much have to then say there is no case left. I don't know that there is no case. Is that what you're saying? No, I'm not saying that, Your Honor, because I can't say that. It sounded to me like you were. I'm trying not to. Okay, so you said, okay, you have to have an exceptional case. This is not an exceptional case, so give me an exceptional case. What does an exceptional case look like? So, you know, you say, oh, these are very rare, you know, and then they come along. So, okay, so this was your final argument. Yes, and an exceptional case would be where you didn't have evidence that traditional redistricting criteria could explain every single change that was made to a very diverse district. I think an exceptional case. I have a hard time imagining a case where some lawyer can't come up with, I mean, if you can make up anything you want to by post-hacker rationalization, I have a hard time coming up with any case where that can't be done. You can't do it in this case, Your Honor, because of the nature of the criteria that were used. They are objectively verifiable criteria. So, yes, a lawyer could make it up. These are not the kind you can make up. Ms. Johanson, I have a question about the shape of the CD10. Yes. What role, if any, does that play in the Shaw analysis here? Well, it has played a great role in the Shaw analysis, as we can see, and we attached the shapes of those districts. You compare CD10 to those districts, and there's nothing like it. I mean, CD10 is a compact district. Thank you, Your Honors. Okay. Thank you. And, Heidi, I think you have the better part of a minute left. We'll just round it to a minute. How's that? On the question of intent here in the Supreme Court, opposing counsel keeps emphasizing that everything is explainable by traditional redistricting criteria. I've tried to explain, we tried in our brief to explain why that's really not true, for example, in the case of the Palms, where they did things that aren't consistent with traditional redistricting criteria, namely to take voters out of a district that's already depopulated, doesn't have a high enough population. So we submit that they're simply incorrect when they say that. But it is the case in the Bethan Hill case in front of the Supreme Court that the issue of what happens when there's traditional redistricting criteria and also evidence of race, what is the standard and how do you apply that? That is an issue there. It seems to me it's an issue here, and the Court would want to wait and see how the Supreme Court comes out on that. On the question of whether or not the City Council and so on followed Commissioner Ellison and his control over the redistricting and so on, I still think that the statements by City Council President Wesson afterwards indicate that he won, that he got what he wanted, which was to have these districts, two districts, set up based on race. And the number of people that Commissioner Ellison said he wanted to move into Council District 10, the number of African-American people, he said 40 percent. That's exactly what happened here. Okay. Thank you. Thank you. The case for arguable stand submitted. We're adjourned. All rise.
judges: Kozinski, Watford, Bennett